```
 1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEBRASKA
 2
    DAVID J. YOUNG,                    )
 3                                     ) Case No.
                        Plaintiff,     ) 8:07-CV-00265
 4                                     )
                                       )
 5          v.                         )
                                       )
    STUART J. DORNAN,                  )
 6  individually and in his            )
    official capacity; DOUGLAS         )
 7  COUNTY, NEBRASKA, a                )
    political subdivision of the       )
 8  State of Nebraska, et al.,         ) TAKEN IN BEHALF
                                       ) OF PLAINTIFF
 9                      Defendants.    )

10

11

12

13

14           DEPOSITION OF JENNA R. JOHNSON, taken

15      at 8:55 a.m. on May 14, 2009, by Alvin J.

16      Thibault, RPR, CSR and General Notary Public in

17      and for the State of Nebraska, taken at Erickson

18      Sederstrom, 10330 Regency Parkway Drive, Suite

19      100, Omaha, Nebraska.

20

21

22

23                                      COPY

24

25
```

```
 1   APPEARANCES:

 2

     MR. THOMAS J. YOUNG              For Plaintiff
 3   Attorney at Law
     2433 South 130th Street
 4   Omaha, Nebraska 68144-2528

 5   MR. ALAN M. THELEN              For Defendant
     Assistant City Attorney        City of Omaha
 6   804 Omaha/Douglas Civic Center
     1819 Farnam Street
 7   Omaha, Nebraska 68183-0001

 8   MR. DOUGLAS L. PHILLIPS         For Defendant
     Attorney at Law                Jenna Johnson
 9   KLASS STOIK MUGAN
     VILLONE PHILLIPS
10   4280 Sergeant Road
     Suite 290
11   Sioux City, Iowa 51102-0327

12   MS. KRISTIN M. LYNCH           For Defendant
     MR. TIM DOLAN                  Douglas County
13   DEPUTY DOUGLAS COUNTY ATTORNEYS
     1819 Farnam Street
14   #LC2
     Omaha, Nebraska 68183

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    E X H I B I T   I N D E X

 2   Ex.        Pg. Ref.
     No.        No.        Description
 3

 4     1         11   Incident Report Prepared By Andrew
                      Perrone
 5
       2         13   Incident Report No. 2005-R00304
 6
       3         14   Memo of an Interview of Katie Ryan
 7                    with Desiree Shipman and Annette
                      Schmeling
 8
       4         16   Memo of an Interview of Samantha
 9                    Peterson with Desiree Shipman and
                      Annette Schmeling
10
       5         21   Report of Officer Angie Circo, RB
11                    Number F-20413 AA

12     6         26   One-Party Consent Call

13     7         29   Videotaped Interview of Jenna
                      Johnson
14
       8         30   Transcription of Jenna Johnson's
15                    Deposition taken by Mr. Davis

16     9         36   Portion of the Trial Transcript of
                      Jenna Johnson's Testimony
17

18

19

20

21

22

23

24

25
```

1          MR. YOUNG:  Standard stipulations?

2          MR. THELEN:  Reserving objections to

3    the time of trial, except form and foundation?

4          MR. YOUNG:  Yes.

5          MR. PHILLIPS:  Agreed.

6          MR. YOUNG:  Is that okay with the

7    County, the standard stipulations?

8          MS. LYNCH:  Sure.

9                  JENNA R. JOHNSON

10         Of lawful age, being first
           duly cautioned and solemnly
11         sworn as hereinafter certified,
           was examined and testified as
12         follows:

13                 DIRECT EXAMINATION

14   BY MR. YOUNG:

15         Q.    Ready?

16         A.    Yes.

17         Q.    Would you please state your name for

18   the record?

19         A.    Jenna Johnson.

20         Q.    Middle initial?

21         A.    R.

22         Q.    And how old are you?

23         A.    Twenty-four.

24         Q.    And where do you currently reside?

25         A.    Washington, D.C.

JENNA JOHNSON - DIRECT (Young)                          5

```
 1          Q.    Is there an address back in
 2    Washington?
 3          A.    There is.  Would you like me to -- do
 4    I need to give that?
 5                MR. PHILLIPS:  Why do you need it?
 6    I can contact her for you any time you need to
 7    find something out.  If it's not listed, I don't
 8    think she needs to tell you.
 9                MR. YOUNG:  If it's not listed?
10                MR. PHILLIPS:  Is it?  Can I look in
11    the Washington, D.C. phone book and find your
12    address?
13                THE WITNESS:  I believe it's
14    unlisted.  That's one thing I just would rather
15    not give out.
16          Q.    All right.  We can go past that one.
17    Why don't you give me your educational
18    background.
19          A.    I graduated from the University of
20    Nebraska in Lincoln in 2007 with a bachelor's in
21    news editorial.
22          Q.    And you understand you're here on a
23    lawsuit where the plaintiff is David Young --
24          A.    Yes.
25          Q.    -- and there are numerous defendants?
```

JENNA JOHNSON - DIRECT (Young)                              6

```
 1              A.    Yes.

 2              Q.    Are you familiar at all with the

 3     Complaint that was filed?

 4              A.    Yes.

 5              Q.    You've had your deposition taken

 6     before?

 7              A.    Yes.

 8              Q.    And you've testified at trial?

 9              A.    Yes.

10              Q.    So I -- I'll with -- withhold going

11     through the normal, tell you how to answer, et

12     cetera.  If you have any questions, stop me and

13     ask me.  Okay?

14              A.    Okay.

15              Q.    All right.  Did you do anything to

16     prepare for this deposition?

17              A.    Yes.

18              Q.    What was that?

19              A.    I read through the police report and

20     my deposition and my trial testimony and I met

21     with my attorney.

22              Q.    Are you employed now?

23              A.    Yes.

24              Q.    Who do you work for?

25              A.    The Washington Post.
```

JENNA JOHNSON - DIRECT (Young)                                    7

1          Q.    And what -- what's the nature of your

2    job?

3          A.    I'm a full-time reporter there.

4          Q.    How long have you held that job?

5          A.    Two years.

6          Q.    Are you single still?

7          A.    Yes.

8          Q.    Engaged?

9          A.    No.

10         Q.    Do you live by yourself?

11         A.    Yes.

12         Q.    Do you understand that the Complaint

13   that was filed in this matter has several causes

14   of action?

15         A.    Yes.

16         Q.    There's one pursuant to the federal

17   statute, it's normally referred to as a Section

18   1983 claim.

19         A.    Yes.

20         Q.    And there are state law claims for

21   false imprisonment, malicious prosecution and

22   abuse of process.

23         A.    Right.

24         Q.    You understand that.  Okay.  The

25   prior criminal trial in this matter arises out of

1    an incident that occurred on June 5 of 2005, is

2    that correct --

3          A.    Yes.

4          Q.    -- that involved your interaction

5    with the plaintiff, David Young?

6          A.    Yes.

7          Q.    And the prior criminal trial was one

8    for first degree sexual assault?

9          A.    Correct.

10         Q.    And primarily the matters that are,

11   perhaps, the most pertinent here were the morning

12   hours of June 5th of '05 --

13         A.    Right.

14         Q.    -- specifically about three o'clock

15   until six o'clock in the morning?

16         A.    Correct.

17         Q.    Taking a step back with regard to the

18   sexual assault charge, when did you become aware

19   or learn for a first degree sexual assault charge

20   that there would have to be a claim of

21   penetration?

22         A.    I have no idea.  I don't think that

23   was until later on.

24         Q.    I'm trying to get a heads up on how

25   much later on.  Do you have any idea?

1       A.    I have no idea.

2       Q.    The events of that morning are pretty

3   well chronicled in the -- at least your testimony

4   would be pretty much chronicled in the -- your

5   deposition testimony and your trial testimony,

6   would it not?

7       A.    Oh, yes.

8       Q.    And you've reviewed both of those?

9       A.    Yes.

10       Q.    And is there anything in either one

11   of those that you recall that you take issue with

12   now or you disagree with as far as your

13   testimony?

14       A.    Not -- not that I know of.

15       Q.    In the report that I've read,

16   somewhere around six o'clock in the morning your

17   friend, Katie Ryan, made a call to campus

18   security with regard to David Young's car being

19   in the parking lot?

20       A.    Yes.

21       Q.    And that was subsequent to a

22   conversation with you, correct?

23       A.    Yes.

24       Q.    And at that point in time there was

25   no mention of any type of assault or sexual

JENNA JOHNSON - DIRECT (Young)                    10

1   assault, is that your understanding?

2        A.    Not at that time, no.

3        Q.    So that's correct?

4        A.    What do you mean, in the phone call

5   conversation or in our conversation?

6        Q.    In the phone call conversation that

7   Katie Ryan had with campus security, was there

8   any claim of any type of assault or sexual

9   assault?

10       A.    No.

11       Q.    And, as I understand it, you and

12  Katie Ryan met with a Mr. Perrone and a security

13  officer, Mr. Martins, at approximately 12:50 in

14  the afternoon of that day?

15       A.    Yes.

16       Q.    And was there any mention of the

17  sexual assault at that time with -- by either --

18  by you with regard to Mr. Perrone or Officer

19  Martins?

20       A.    Yes.

21       Q.    Okay.  And was there any claim of any

22  type of penetration?

23       A.    I told them that he touched me, but I

24  didn't say how or where.

25       Q.    In fact, you made no claim of

1    penetration, correct?

2         A.    Well, no.  But they didn't ask

3    or -- I don't know.

4         Q.    You made no claim?

5         A.    Well, I said -- I said that he

6    touched me.  I -- you know, interpret that as you

7    will.

8         Q.    My specific question is:  Did you

9    make a claim of penetration?

10        A.    No.

11        Q.    All right.

12              (Deposition Exhibit Number 1 was

13    marked for identification.)

14        Q.    I'll hand you what the court reporter

15    has marked as Deposition Exhibit 1.  That's the

16    incident -- that's the incident report prepared

17    by Andrew Perrone based upon his interview with

18    you and, I believe, Katie Ryan.  Have you seen

19    that report before?

20        A.    No.

21        Q.    Why don't you take a second to review

22    it.

23              MR. PHILLIPS:  Take as long as you

24    need.

25              MR. YOUNG:  I didn't mean to

JENNA JOHNSON - DIRECT (Young)                                    12

1    restrict her otherwise, Counsel.

2         A.    Okay.

3         Q.    I'll direct your attention to the

4    second page, first full sentence, and the

5    second -- and the next sentence after that.

6         Jenna reports that, comma, while she did not

7    believe that David attempted to force intercourse

8    with her, she did feel extremely uncomfortable

9    with David being so close to her with his pants

10   off and having him remove her pants.  She does

11   not believe that he ever penetrated her or ever

12   successfully forced intercourse.

13        Do you see that in the report?

14        A.    Yes.

15        Q.    Is that what you told Mr. Perrone and

16   Officer Martins?

17        A.    I -- I told them what woke me up was

18   him touching me, but yes.

19        Q.    You specifically said no penetration?

20        A.    Yes.

21        Q.    Can --

22              (Deposition Exhibit Number 2 was

23   marked for identification.)

24        Q.    I'll hand you what the court reporter

25   has marked as Deposition Exhibit No. 2.  I would

JENNA JOHNSON - DIRECT (Young)                    13

1    ask you to look at it and tell me whether or not

2    you've seen it before?

3         A.    No.

4         Q.    Would you take a moment to review it,

5    please?

6         A.    Okay.

7         Q.    Once again, there's no indication of

8    any claim of penetration; is that correct?

9         A.    Yes.

10        Q.    And, in fact, did you tell Officer

11   Perrone -- I mean Officer Martins that you did

12   feel that you had been in control of the

13   situation?

14        A.    Yes.

15        Q.    And, in fact, the only claim

16   basically made in this report by you to Officer

17   Martins is that Young had removed his pants and

18   pulled down her pants.  Do you see that on the

19   second page at the bottom of the first paragraph?

20        A.    That's what it reads, yes.

21        Q.    In fact, is that the information that

22   you gave Officer Martins?

23        A.    Yes.

24        Q.    Now, as I understand it, you and

25   David Young were alone in a bedroom, correct?

1          A.     Yes.

2          Q.     And Katie Ryan was not there at the

3    time of the incident?

4          A.     Correct.

5          Q.     Would I be correct in understanding

6    that the only information Katie Ryan would have

7    is information that you provided to her?

8          A.     Yes.

9                 (Deposition Exhibit Number 3 was

10   marked for identification.)

11         Q.     I'll hand you what's been marked as

12   Deposition Exhibit No. 3 and ask if you've ever

13   seen that before?

14         A.     No.

15         Q.     Would you take a moment to review it,

16   please?

17         A.     Okay.

18         Q.     In this memo of an interview

19   apparently with Desiree Shipman and Annette

20   Schmeling -- I think it's Sister Annette

21   Schmeling -- Katie Ryan does not indicate any

22   type of penetration?

23         A.     No, it doesn't appear so.

24         Q.     And, once again, the only information

25   that Katie Ryan had was information which you

JENNA JOHNSON - DIRECT (Young)                    15

1   provided to her, correct?

2        A.   Yes.

3        Q.   And on the second page it indicates

4   that you and Katie and Samantha -- Samantha

5   Peterson, the other resident of that apartment,

6   were laughing about the ridiculous things David

7   was saying to seduce her -- you?

8        A.   Yes.

9        Q.   Do you see that?

10       A.   I see it.

11       Q.   And then you and Katie apparently

12   went to Village Inn for breakfast around ten

13   o'clock?

14       A.   Yes.

15       Q.   So there was laughter in your

16   conversation with Samantha and Katie with regard

17   to David's actions?

18       A.   Yes.

19       Q.   And the other individual who resided

20   at the apartment was Samantha Peterson, correct?

21       A.   Correct.

22       Q.   And, once again, she wasn't in the

23   bedroom that you and David Young were in?

24       A.   No.

25       Q.   So the only thing she would know is

1    what you would tell her, correct?

2          A.    Correct.

3                (Deposition Exhibit Number 4 was

4    marked for identification.)

5          Q.    I'll hand you what's been marked as

6    Deposition Exhibit No. 4 by the court reporter

7    and ask you to review it and tell me if you've

8    seen that report before?

9          A.    No.

10         Q.    Okay.  Would you take a moment to

11   review it, please?

12         A.    Okay.

13         Q.    The only basic information provided

14   by a Samantha Peterson to Creighton regarding

15   David Young's conduct was that he was apparently

16   attempting to take your clothes off and saying

17   disgusting things to you?

18         A.    Yes.

19         Q.    No mention of any penetration in that

20   report, either, is there?

21         A.    No.

22         Q.    I believe that report indicates that

23   that was as of 4:45 in the afternoon on -- well,

24   that was June 6th.  So that was not Sunday, the

25   day of the incident, actually, was it?

JENNA JOHNSON - DIRECT (Young)                    17

1        A.    No.

2        Q.    All right.  So my understanding is

3   that you did go home that day, on Sunday, the

4   5th, correct?

5        A.    Yes.

6        Q.    And you apparently had a conversation

7   with your mother regarding this incident?

8        A.    Yes.

9        Q.    And did that provoke a phone call to

10  the police department?

11       A.    Not that conversation, no.

12       Q.    Am I correct in understanding it

13  wasn't until you had a conversation with your

14  father, apparently by telephone that evening,

15  that you made a decision to -- I believe it was

16  to call the telephone -- I think it's reporting

17  line or something like that?

18       A.    Yes.

19       Q.    And at that point in time -- was that

20  on June 5th or June 6th when you talked to your

21  dad?

22       A.    It was on Sunday.

23       Q.    That would be the 5th?

24       A.    The 5th, yes.

25       Q.    In the evening?

JENNA JOHNSON - DIRECT (Young)                          18

1        A.      Yes.

2        Q.      And when did you make that phone call

3    to the PRU line or whatever it's called?

4        A.      Immediately after talking to my dad.

5        Q.      And that must have been in the

6    evening, then?

7        A.      Yes.

8        Q.      Do you know approximately what time

9    it was?

10       A.      I have no idea.

11       Q.      And that is the first time that we --

12   that you mention to anyone, at least as far as

13   the reports that we have go, of any type of an --

14   I believe you reported an attempted rape?

15       A.      I don't remember what I said on that

16   report of mine.

17       Q.      And to the -- apparently you were

18   transferred then to 911?

19       A.      Correct.

20       Q.      And is it the next day, then, the

21   6th, that officers come and interview you at your

22   home?

23       A.      Yes.

24       Q.      So the first indication we have of

25   anything dealing with a rape charge is the

JENNA JOHNSON - DIRECT (Young)                    19

1      evening of June 5th?

2                   MR. PHILLIPS:  Objection, form.

3           A.    I'm sorry, what's the question?

4           Q.    The first indication of anything

5      dealing with a rape charge or allegation is the

6      evening of June 5th after you talked to your

7      father?

8                   MS. LYNCH:  I would object to the

9      form of the question as far as semantics, with

10     some of the words that are being used as far as

11     rape.

12          Q.    Go ahead and answer.

13          A.    I can't press charges.  I reported

14     what happened.  The first time I talked to an

15     official who knew the correct questions to ask me

16     to lead to what was later defined as a first

17     degree sexual assault was on Monday.

18          Q.    When is the first time you mentioned

19     rape to any official or any third party?

20          A.    I don't remember.

21                  MS. LYNCH:  Again, I would object to

22     the form of the question, if she knows what the

23     definition of rape or what we're talking about

24     when we say rape here.

25          Q.    I'm asking you when the first time

1   that you used the word "rape"?

2       A.   I don't remember.

3       Q.   Well, it certainly wasn't in the

4   conversation with Katie Ryan and Samantha

5   Peterson earlier on the day of June 5th, was it?

6            MS. LYNCH:  Again, I would just have

7   to make an objection, argumentative.  I believe

8   that she's testified as to what she said.

9   Whether or not that is defined as rape or --

10  she's already testified as to what she told

11  people at the time.

12           MR. YOUNG:  Counsel, I'm simply

13  asking when she used -- the first time she used

14  the word "rape."

15           MR. PHILLIPS:  And she just told you

16  she does not recall when she first used the word

17  "rape."

18      Q.   You don't recall if you used it

19  before the evening of January -- of June 5th or

20  you do recall that?

21      A.   I -- I don't remember how I ever -- I

22  don't remember.

23           (Deposition Exhibit Number 5 was

24  marked for identification.)

25      Q.   I'll hand you what's been marked as

1    Deposition Exhibit No. 5.  Have you ever -- I'll

2    ask you to review it and I'll ask if you've ever

3    seen that document before?

4        A.    Yes.

5        Q.    Is this one of the documents you

6    reviewed in preparation for your deposition?

7        A.    Yes.

8        Q.    I'll -- I'll refer you to page 3 of

9    8, and slightly past halfway down on the first

10   paragraph, the sentence that starts:  Johnson

11   woke up to find her pants and underwear being

12   pulled down.  Do you see that sentence?

13       A.    That's not the way the sentence reads

14   in my version.

15       Q.    Okay.

16       A.    Johnson woke up to find her pants and

17   underwear had been pulled down to about her mid

18   thigh area.

19       Q.    And then the next sentence with

20   regard to the claim of insertion of two fingers

21   in your vagina --

22       A.    Yes.

23       Q.    -- do you see that?

24       When is the first time you recall making

25   that claim or that allegation?

JENNA JOHNSON - DIRECT (Young)                          22

```
 1            A.     To who?

 2            Q.     To anyone.

 3            A.     Using these words?

 4            Q.     Well, or words to that effect, yes.

 5    When did you --

 6            A.     I -- I told several people that he --

 7    I woke up and that he was touching me.  When I

 8    talked to the police, I had to use more

 9    scientific terms and that's when I said things

10    such as two fingers and vagina.

11            Q.     And insertion and basically

12    penetration?

13            A.     Exactly, yes.

14            Q.     Which is never mentioned beforehand.

15    It's never mentioned until then, is it?

16                   MR. PHILLIPS:  Wait for a question.

17            Q.     It's never mentioned until you talked

18    to the police?

19            A.     Yes.

20                   MR. PHILLIPS:  Wait for a question.

21    Don't respond to statements.

22            Q.     Is that correct?

23            A.     I'm sorry, what's the question?

24            Q.     It's never mentioned until you talk

25    to the police; is that correct?
```

JENNA JOHNSON - DIRECT (Young)                          23

1              MR. PHILLIPS:  Objection, form.

2         Q.    Go ahead and answer.

3         A.    I -- yes.

4         Q.    When and to whom?

5         A.    What's the question?

6         Q.    The first time you mentioned

7    Mr. Young inserting two fingers into your vagina

8    was when you talked to the police; is that

9    correct?

10        A.    Yes.

11        Q.    Thank you.  As long as we have this

12   report, if you go to -- turn to page 6 of 8 for

13   me, please.

14        A.    After this I'd like to take a break.

15        Q.    Any time you want to take a break,

16   just let me know.

17             MR. PHILLIPS:  There isn't a

18   question right now.  Do you want to take a break?

19        A.    Can we take a break now?

20        Q.    Sure.  Yeah, that's fine.

21             (A short recess was taken.)

22        Q.    What page did I point you to?  Six?

23        A.    Yes.

24        Q.    Well, I meant seven.  I'm sorry.

25        A.    Okay.

1          Q.    And this deals with -- the bottom of

2    the page, the last full paragraph and the next

3    four lines at the bottom of the page, and that's

4    dealing with the -- some events that happened --

5    that occurred post the -- what's referred to as

6    the one-party consent call.  Apparently you were

7    contacted on June 22nd, I assume, 2005, not 2004,

8    by Officer Circo; is that correct?

9          A.    Yes.

10         Q.    And that was with regard to the

11   statement in the one-party consent call of

12   Mr. Young or his statements dealing with oral

13   sex, correct?

14         A.    Correct.

15         Q.    Am I correct in understanding that

16   Officer Circo wanted to clarify whether or not

17   there was any substance to Mr. Young's statements

18   in that call?

19         A.    Yes.

20         Q.    And on the telephone did you, in

21   fact, admit to the events as stated by Mr. Young

22   in the call?

23                MR. PHILLIPS:  Object to form.

24                MR. YOUNG:  And let me rephrase it.

25         Q.    You talked to Officer Circo on the

JENNA JOHNSON - DIRECT (Young)                          25

1    phone?

2         A.    Correct.

3         Q.    Was there an admission of -- on your

4    part in your conversation with Officer Circo that

5    oral sex had, in fact, occurred on that morning?

6         A.    Correct.

7         Q.    And then apparently did Officer Circo

8    have you come down to Project Harmony once again?

9         A.    Yes.

10        Q.    And did you have a conversation with

11   her regarding that subject?

12        A.    Correct.

13        Q.    Can you relate what you recall to us

14   of that conversation?

15        A.    I got down there and we sat down and

16   again she reminded me how important it was to

17   tell the truth, and at that point she asked me

18   again about it and I denied it.

19        Q.    In your conversation with Officer

20   Circo, was she trying to sway you in any way as

21   far as providing information regarding that

22   subject?

23        A.    No.

24        Q.    Was she couching -- coaching --

25   coaching you to deny the oral sex in any way?

JENNA JOHNSON - DIRECT (Young)                    26

1        A.    No.

2        Q.    It was all of your own decision as

3    far as the position that you took at that point

4    in time?

5        A.    Yes.

6        Q.    Am I correct in understanding that

7    when you were down at Project Harmony, again, you

8    denied the oral sex on two separation occasions

9    with -- in your conversation with Officer Circo?

10       A.    Yes.

11       Q.    Okay.  She didn't try and talk you

12   into recanting your previous admission?

13       A.    No.

14             MR. YOUNG:  Let's go off the record

15   a minute.

16             (An off-the-record discussion was

17   held.)

18             (Deposition Exhibit Number 6 was

19   marked for identification.)

20       Q.    I'll hand you what's been marked as

21   Deposition Exhibit No. 6.  Have you seen that

22   before?

23       A.    Yes.

24       Q.    The only questions I have with regard

25   to the one-party consent call relate to the

1    recording device utilized by Officer Circo.

2    Apparently there was a claim of some type of

3    failure of the recording device; is that correct?

4        A.    Correct.

5        Q.    Could you tell me what you recall

6    happening with regard to the recording device?

7        A.    She hooked the device up to the

8    phone.  I made the phone call.  During the phone

9    call something happened with it.  I don't know if

10   the tape broke or the machine jammed.  She

11   jiggled it a little bit and ran out of the room,

12   came back with another tape player and hooked

13   that tape player up.

14       Q.    Do you recall how -- and this is when

15   the conversation was ongoing on the phone?

16       A.    Correct.

17       Q.    Do you recall how early in the

18   telephone call that occurred?

19       A.    No.  I don't -- I don't remember when

20   it happened.

21       Q.    Do you recall whether it was at the

22   very end or middle or the beginning?

23       A.    I don't -- I don't know.

24       Q.    Well, did the recording device simply

25   stop working?

JENNA JOHNSON - DIRECT (Young)                    28

1        A.    I --

2              MR. THELEN:  Object to foundation.

3        Q.    Just tell me what you observed.

4        A.    Well, I was focused on the phone call

5    conversation.

6        Q.    Right.

7        A.    Something happened to the machine.  I

8    mean, I think it made a sound or something

9    happened.

10       Q.    Okay.

11       A.    I have no idea what.

12       Q.    Okay.

13       A.    I wasn't focused on that.

14       Q.    And then was it replaced with another

15   machine?

16       A.    I believe so.

17       Q.    Do you recall any problems after that

18   occurred?

19       A.    No.

20       Q.    Officer Circo unplugged whatever

21   attachment she had for recording the telephone

22   conversation from the one unit and then plugged

23   them into another unit.  Would that be correct?

24       A.    I believe so.

25       Q.    Ms. Johnson, on June 16th of 2005 you

1   had a taped interview with Officer Circo at

2   Project Harmony; is that correct?

3          A.    Correct.

4                (Deposition Exhibit Number 7 was

5   marked for identification.)

6          Q.    And that interview was tape recorded,

7   correct?

8          A.    Correct.

9          Q.    It's on a videotape?

10         A.    Yes.

11         Q.    Have you ever reviewed that

12  videotape?

13         A.    Yes.

14         Q.    I'll hand you what the reporter has

15  marked as Deposition Exhibit 7 and ask you if

16  you've ever seen that before?

17         A.    Yes.

18         Q.    And that's a transcript, once again,

19  by Cynthia A. Craig of Thomas & Thomas Reporters

20  of that interview -- taped interview?

21         A.    Yes.

22         Q.    All right.  I'm not going to ask you

23  questions on that.  I just wanted to put that in

24  the record along with the consent call.

25                (Deposition Exhibit Number 8 was

JENNA JOHNSON - DIRECT (Young)                          30

1    marked for identification.)

2         Q.    I'll hand you what's been marked as

3    Deposition Exhibit No. 8, which is the

4    transcription of your deposition taken by

5    Mr. Davis.  Would you review it and see if that's

6    what it appears to be.  Does it?

7         A.    Yes.

8         Q.    And I'm not going to ask you

9    questions about it.

10        A.    Okay.

11        Q.    Do you recall that David Young was

12   arrested for first degree sexual -- the charge of

13   first degree sexual assault, I believe it was

14   August 24th of 2005?

15        A.    Yes.

16        Q.    And the arrest warrant was issued

17   shortly before that, I believe it was somewhere

18   around the 18th or 19th of August of that year?

19        A.    Yes.

20        Q.    Up until that point in time, late

21   August, had you indicated to law enforcement

22   officers the nature of consensual conduct that

23   occurred on the morning of the incident between

24   you and Mr. Young?

25        A.    What's the question?

1          Q.    I'm trying to get at what police

2     officers knew at the time an arrest warrant was

3     issued for Mr. Young.  Did they know about the

4     consensual conduct between you and Mr. Young?

5          A.    They knew everything in that Project

6     Harmony videotaped conversation, everything in

7     the police report.

8          Q.    They didn't know about the oral sex,

9     did they?

10         A.    Correct.

11         Q.    And they didn't know about the

12    consensual conduct between you and Mr. Young?

13         A.    What does consensual conduct mean?

14    They knew that we kissed.  They knew that we made

15    out.

16         Q.    They didn't know about the more

17    intimate details of the conduct of both parties,

18    did they?

19                    MR. PHILLIPS:  Object to the form.

20         Q.    Go ahead and answer.

21         A.    What's the question?

22         Q.    Let me take a step back.  In your

23    Project Harmony interview you indicated there was

24    no consensual conduct, correct?

25         A.    Correct.

JENNA JOHNSON - DIRECT (Young)                    32

1         Q.    In your deposition and trial

2    testimony there was considerably different

3    testimony from you regarding the conduct of the

4    parties in that there was consensual sexual

5    conduct between the two of you; is that correct?

6         A.    Yes.

7         Q.    Okay.  Did the police know about that

8    when the arrest warrant was issued?

9                   MR. PHILLIPS:  Object to form.

10                  MR. THELEN:  Object to form and

11   foundation.

12        Q.    Had you disclosed it to the police?

13        A.    No, I had not told the police about

14   the oral sex at that point.

15        Q.    How about the other consensual

16   conduct between the parties?

17                  MR. PHILLIPS:  Object to the form.

18                  MR. THELEN:  Same objection.

19        Q.    Strike that.  Let me try it a

20   different way.  Is what the police knew when the

21   arrest warrant was issued what is contained in

22   the Project Harmony interview?

23        A.    Yes.

24        Q.    Did they know anything else besides

25   that?

1              MR. PHILLIPS:  Object, foundation.

2       Q.    Go ahead and answer.

3              MR. THELEN:  Same objection.

4       A.    Not that I know of.

5       Q.    You didn't provide them any other

6   information of conduct between you and Mr. Young

7   of that morning?

8       A.    No.

9       Q.    Okay.  That's all I'm trying -- I

10  just want to know what the police knew, what you

11  had conveyed to the police at the time the arrest

12  warrant was issued, and nothing more than what

13  they would have gotten out of the Project Harmony

14  interview?

15      A.    Is that a question?

16      Q.    Yes.

17      A.    Yes.

18      Q.    So if I look at the Project Harmony

19  interview, then I know what the police knew at

20  the time they determined that an arrest warrant

21  was appropriate?

22             MR. PHILLIPS:  Object to the form.

23      A.    I believe so.

24      Q.    Okay.  Am I correct in understanding

25  that up to the point Mr. Young was arrested in

```
 1    August of 2005, it was your desire that Mr. Young

 2    be arrested for first degree sexual assault?

 3         A.    I wanted him to be held accountable.

 4    I had no say in what charges would be pressed.

 5         Q.    I didn't indicate -- I'm not -- the

 6    question didn't indicate that you had any say in

 7    it, but the question was:  You wanted him charged

 8    with first degree sexual assault?

 9         A.    Yes.

10              MR. PHILLIPS:  I think she's

11    answered that.

12         A.    I just answered it.

13         Q.    And the answer is?

14         A.    The answer is I had no control over

15    what charges they pressed, but, yes, I wanted him

16    held responsible for what had happened.  I wanted

17    him to be arrested, yes.

18         Q.    You wanted him to be charged?

19         A.    Yes.

20         Q.    And you wanted him to, at least,

21    endure the prosecution for those charges,

22    whatever the police and county attorney decided?

23         A.    Yes.

24         Q.    Did you want him to also go to jail?

25         A.    I don't know.
```

JENNA JOHNSON - DIRECT (Young)                    35

```
 1          Q.    Never thought about it up to that
 2    point in time?
 3          A.    No.
 4          Q.    And up to this point in time, you're
 5    not telling the truth, are you?
 6                MR. PHILLIPS:  Up to what point in
 7    time?
 8          Q.    Up until August of 2005 when
 9    Mr. Young is arrested, you were not telling the
10    police the truth; is that correct?
11          A.    I did not tell them the truth about
12    the oral sex, correct.
13          Q.    You actually told them that you had
14    never touched his penis also, correct?
15          A.    Correct.
16          Q.    That wasn't truthful, was it?
17          A.    No, it was not truthful.
18          Q.    Not that you would have any
19    knowledge, but I will ask the question and you
20    can tell me that you have no idea if that such is
21    the answer, but do you have any idea why a tape
22    recorder utilized for the one-party consent call
23    would be able to record your question to
24    Mr. Young but not his answer and do that three
25    more times after that?
```

JENNA JOHNSON - DIRECT (Young)                    36

1              MR. PHILLIPS:  Object to the form,

2     foundation.

3         Q.    I'm just asking if you have any idea

4     why it would do that?

5              MR. THELEN:  Same objection.

6         Q.    Please answer.

7         A.    I have no idea.

8              MR. YOUNG:  Let's go off the record.

9              (An off-the-record discussion was

10    held.)

11             MR. YOUNG:  Back on the record, I

12    guess.

13             (Deposition Exhibit Number 9 was

14    marked for identification.)

15        Q.    Okay.  I'll hand you what the court

16    reporter has marked as Deposition Exhibit 9.  I

17    will represent to you that that is the portion of

18    the trial transcript of your testimony.  I --

19    because I do not know whether the transcripts

20    jibe as to what all the parties have.  I'd like

21    to go through some of the transcript.  I'm simply

22    going to ask -- refer you to the particular pages

23    and lines and ask if you have any dispute with

24    that being your testimony and those being the

25    questions asked.  I do not want to ask -- I'm not

JENNA JOHNSON - DIRECT (Young)                    37

```
 1     going to be asking questions as much as I just

 2     want to know whether the transcript is accurate

 3     to your recollection.

 4          A.    Got it.

 5          Q.    If you would go to page 56, line 22,

 6     to 57, line 21.  Does that comport with your

 7     recollection?

 8          A.    Yes.

 9          Q.    Page 61, line 1 to line 6 -- line 8

10     comport with your recollection?

11          A.    Yes.

12          Q.    Page 65, line 11, to page 66, line 5.

13          A.    Yes.

14          Q.    And page -- and I appreciate you're

15     just answering when it comports with your

16     recollection.  Page 67, line 9 through 15?

17          A.    Yes.

18          Q.    Page 69, line 10 through line 24?

19          A.    Yes.

20          Q.    Page 70, line 9, through 71, line 6.

21          A.    Yes.

22          Q.    Page 72, line 11 through line 25?

23          A.    Yes.

24          Q.    Page 73, line 14, through 74, line 2?

25          A.    Yes.
```

JENNA JOHNSON – DIRECT (Young)                    38

1          Q.    And on 74, line 14 through 17?

2          A.    Yes.

3          Q.    Page 75, line 3, to page 76 -- or

4    actually through all of 76.  Actually it will go

5    to page 77, line 6.  Did I make that clear enough

6    for you?

7          A.    I have to read through all of them.

8          Q.    Yes.

9          A.    Yes.

10         Q.    Page 88, line 17 through 25?

11         A.    Yes.

12         Q.    Page 89, line 1 through 18?

13         A.    Yes.

14         Q.    Page 90, line 3 through 20?

15         A.    Yes.

16         Q.    Page 92, line 13 through 16?

17         A.    Yes.

18         Q.    Page 95, line 18, through 97, line 1?

19         A.    Yes.

20         Q.    Page 98, line 4 through 8?

21         A.    Yes.

22         Q.    And from line 14 on 98 through line

23    12 of 99?

24         A.    Yes.

25         Q.    Okay.  Page 102, line 3 through 14?

JENNA JOHNSON - DIRECT (Young)                    39

1          A.    Yes.

2          Q.    Line -- page 110, line 10 through 12?

3          A.    Yes.

4          Q.    Page 117, line 18 through 23?

5          A.    Yes.

6          Q.    Page 126, line 7, through 127, line

7     5?

8          A.    Yes.

9          Q.    And then also on 127, line 11

10    through -- well, on to page 128, line 12?

11         A.    Through line what?

12         Q.    Twelve on 128.

13         A.    Yes.

14         Q.    And page 131, line 17, to 132, line

15    7?

16         A.    Yes.

17         Q.    139, line 12 to 21?

18         A.    Yes.

19         Q.    Page 144, line 20, to 145, line 12?

20         A.    Yes.

21         Q.    146, line 3 through line 7?

22         A.    Yes.

23         Q.    With regard to that particular

24    question, I assume it should read lie by

25    omission?

 1                    MR. PHILLIPS:  Just a second.

 2         Q.    If you recall?

 3                    MR. PHILLIPS:  What is the question?

 4         Q.    I assume that should read lie by

 5    omission, is that correct, or do you recall?

 6                    MR. PHILLIPS:  Do you remember?

 7                    MS. LYNCH:  Objection, foundation.

 8                    MR. PHILLIPS:  The question is, do

 9    you remember whether you said what appears on

10    line 3?

11                    MS. LYNCH:  It was the question.

12                    MR. YOUNG:  It was the question.

13         A.    I don't know.  I don't know.  I can't

14    remember what the question was.

15         Q.    That's fine.  Then line -- on page

16    146, are you still there?

17         A.    Uh-huh.

18         Q.    Line 21 through 23.  And then -- is

19    that all right?

20         A.    Yes.

21         Q.    And then line 25, on to page 147,

22    line 4?

23         A.    Yes.

24         Q.    Page 148, line 25, through 149, 7?

25         A.    Yes.

JENNA JOHNSON - DIRECT (Young)                    41

```
 1          Q.    And then on the same page, line 14
 2    through 18?
 3          A.    Yes.
 4          Q.    Page 150, line 5 through 25?
 5          A.    Yes.
 6          Q.    Page 153, line 20, through 154, line
 7    5?
 8          A.    Yes.
 9          Q.    All right.  So it appears that what I
10    have for the transcript, at least the portions
11    that we've gone over, seem to be accurate as far
12    as your recollection goes?
13          A.    Yes.
14          Q.    All right.  All right.  In your
15    responses to discovery, specifically
16    Interrogatory No. 3, you identify individuals who
17    you recall talking to prior to trial.  Maybe we
18    can go through those.  We've got Katie Ryan.
19    Now, I assume that's pretty much been fleshed out
20    in all the reports and all the deposition
21    testimony and the trial testimony as far as your
22    conversations with Katie Ryan?
23          A.    Yes.
24                MR. PHILLIPS:  Wait for the
25    question.
```

JENNA JOHNSON - DIRECT (Young)                              42

```
 1            Q.    And Samantha Peterson, would I be
 2    correct in understanding that any conversations
 3    you had with her were pretty much confined to the
 4    date of the incident?
 5            A.    Yes.
 6            Q.    All right.  All right.  Let's deal
 7    with -- the next individuals identified are your
 8    mother and father.  All right?
 9            A.    Correct.
10            Q.    All right.  Now, you apparently
11    talked to your mom that Sunday afternoon; is that
12    correct?
13            A.    Yes.
14            Q.    And do you recall when you went home
15    that Sunday, what time?
16            A.    Early afternoon.
17            Q.    And when did you talk to your mom
18    about the incident?
19            A.    Soon after I arrived home.
20            Q.    Do you recall the nature of the
21    conversation?
22            A.    What do you mean by that?
23            Q.    What did you say?  What did she say?
24            A.    We talked about what I had done the
25    night before and in that -- I told her that --
```

JENNA JOHNSON - DIRECT (Young)                          43

1    that this incident happened and then --

2          Q.    Did your mother make any suggestions

3    at that time as to what you should do?

4          A.    She was more concerned with just

5    making sure that I was okay and taken care of.  I

6    mean, she did say she wanted me to talk to my dad

7    about it.

8          Q.    Any other points of conversation

9    between you and your mother that you can recall

10   and tell us?

11         A.    I don't think so.

12         Q.    Your father was out of town in

13   Washington, D.C.; is that correct?

14         A.    Yes.

15         Q.    And do you recall when you talked to

16   him about this incident?

17         A.    Yes.

18         Q.    When was that?

19         A.    That Sunday evening.

20         Q.    Do you know approximately what time

21   it occurred?

22         A.    No.

23         Q.    Do you recall the conversation?

24         A.    Not really.

25         Q.    You don't recall what you said to him

JENNA JOHNSON - DIRECT (Young)                    44

1    and he said to you?

2         A.    Not word for word.

3         Q.    Well, I'm just asking for what you do

4    recall, if you could tell us that.

5         A.    I remember telling him that I had

6    been hanging out at Katie's house and that, I

7    guess, the fact that it happened, that I had

8    woken up and this guy was touching me, and -- and

9    him being my dad, he was -- you know, told me

10   that I -- he was upset that it happened to me and

11   he consoled me.  He was really broken up about

12   it, and he said -- he was the one who suggested

13   that I call the police.

14        Q.    Did you tell your father that there

15   was penetration?

16        A.    I did not use the word "penetration."

17   I told him that --

18        Q.    What do you --

19        A.    -- he was touching me.

20        Q.    That's what I'm asking, what you

21   recall telling your father.

22        A.    What's the question?

23        Q.    What you recall telling your father.

24   You say you didn't use the word "penetration,"

25   but what words did you use, if you recall?  Can

JENNA JOHNSON - DIRECT (Young)                                    45

1   you tell us?

2         A.    I did not use the word "penetration,"

3   but I made it clear to him that this guy was

4   touching me in a very sensitive area.  I don't

5   remember the exact words that I used.

6         Q.    Anything else about the conversations

7   with your mom and dad that day?

8         A.    Not that I can recall.

9         Q.    As far as the incident goes, did you

10  have any other conversations with your mother or

11  your father after that day?

12        A.    Yes.

13        Q.    Okay.  Do you recall any of them?

14        A.    Not specifically.

15        Q.    Do you have a general recollection as

16  to when they occurred?

17        A.    No.

18        Q.    Would they have been ongoing for

19  approximately another year or so after the

20  incident?

21        A.    They've been ongoing for four years.

22        Q.    So they continue to this day?

23        A.    Yes.

24        Q.    Are these conversations about the

25  incident, the Sunday morning incident?

```
 1            A.    No, no.  Not the specific incident,
 2     no.
 3            Q.    That was the nature of my question.
 4            A.    I didn't understand your question
 5     then.
 6            Q.    That's why I just -- I'm trying to
 7     clarify.
 8            A.    Okay.
 9            Q.    Did you have subsequent discussions
10     with regard to the incident, what occurred that
11     morning?
12            A.    Maybe once or twice more, but not
13     substantive discussions about that incident, no.
14            Q.    Do you recall when that might have
15     occurred?
16            A.    No.
17            Q.    Do you recall the content of any of
18     those conversations?
19            A.    I don't.
20            Q.    Did you just generally repeat your
21     prior conversations?
22            A.    Yes.
23            Q.    In conversations with your mother
24     about this incident, when did you, if ever,
25     provide -- let me strike that.
```

JENNA JOHNSON - DIRECT (Young)                    47

1          On the day of the incident, did you tell

2     your mom or your father anything with regard to

3     the consensual sexual conduct that occurred that

4     morning?

5          A.    No.

6          Q.    With regard to your mother, did you

7     ever tell her?

8          A.    Yes.

9          Q.    When was that?

10         A.    After my deposition.

11         Q.    With regard to your father, did you

12    ever tell him?

13         A.    No.

14         Q.    Does he know that --

15         A.    Yes.

16         Q.    -- today?

17         A.    Yes.

18         Q.    Do you know how he knows?

19         A.    I'm guessing my mom told him.

20         Q.    Do you know when that might have

21    occurred?

22         A.    I have no idea.

23         Q.    It would be after you told your mom,

24    obviously?

25         A.    Yes.

JENNA JOHNSON - DIRECT (Young)                    48

1      Q.    Which was after the deposition --

2      A.    Yes.

3      Q.    -- which was March 17th of 2006?

4      A.    Yes.

5      Q.    Am I correct in understanding you've

6   never had a conversation with your father then

7   about that consensual sexual conduct between you

8   and David Young on the day of the incident?

9      A.    Yes.

10     Q.    But you have had such a conversation

11  with your mom?

12     A.    Yes.

13     Q.    Okay.  David Martins and the dorm

14  advisor, I believe that's Martins and Perrone,

15  your contact or your discussions with them would

16  just be that day at Creighton?

17     A.    Was that a question?

18     Q.    Yes.

19     A.    Yes.

20     Q.    You didn't talk to them at any other

21  times, did you?

22     A.    No.

23     Q.    And Officer Christensen, I believe,

24  was the police officer who came out and took the

25  initial report.  You may not remember.

1          A.    I believe it was Cunningham.

2          Q.    Oh, Cunningham, I think you're right.

3    You're right and I'm wrong.  That's the only time

4    you talked to that officer about it?

5          A.    Correct.

6          Q.    And Shipman and Schmeling from

7    Creighton, you didn't talk to them after the --

8    what, the first day or two?

9          A.    I talked to them several times.

10         Q.    Well, let's take, then, Desiree

11   Shipman.  Can you tell me when you talked to her

12   and what the nature of the conversations were?

13         A.    Actually Desiree Shipman, I just

14   talked to on the phone that Monday or Tuesday.

15   It was Schmeling I talked to several times.

16         Q.    Can you tell me about your

17   conversations with her and when they occurred,

18   what the nature of the conversations were with

19   her?

20              MR. PHILLIPS:  Who?

21              MR. YOUNG:  Schmeling.

22              MR. PHILLIPS:  I assume Shipman's a

23   her, too.

24              MR. YOUNG:  I'm talking about Sister

25   Annette Schmeling.

JENNA JOHNSON - DIRECT (Young)                    50

```
 1         A.    They were usually on the phone.   It
 2    was usually her trying to convince me to go
 3    through the court process.
 4         Q.    Do you know when those conversations
 5    occurred?
 6         A.    No.
 7         Q.    Was it in 2005?
 8         A.    It was -- there were -- it was after
 9    the trial.
10         Q.    That would be 2006?
11         A.    Okay.   2006.
12         Q.    Do you know Annette -- it'd have to
13    be after July, then?
14         A.    Yes.
15         Q.    Do you have any idea when she
16    contacted you?
17         A.    I believe it was in August.   I think
18    most of the communication was in August.   Maybe
19    it was -- it was a long time ago.
20         Q.    I take it you declined that
21    suggestion or that opportunity?
22         A.    Yes.
23         Q.    Do you know how many times you talked
24    to Sister Schmeling about that subject?
25         A.    Not exactly.
```

JENNA JOHNSON - DIRECT (Young)                    51

```
 1          Q.    Did you have any conversations with

 2    her about the incident in basically 2005 and 2006

 3    up to the time of the trial?

 4          A.    If -- if she ever called me, I would

 5    just refer her to my lawyer at that point.

 6          Q.    And -- okay.  We've got -- the next

 7    person is Mike Cox.  He's identified as family

 8    attorney.  When did you retain counsel?

 9          A.    Soon after the incident.

10          Q.    Did you attend to that or did someone

11    else?

12          A.    My parents did.

13          Q.    Do you know if it was your father or

14    your mother?

15          A.    I believe my mother made the initial

16    phone calls.  It was both of them.

17          Q.    Okay.  Was that on Monday, the 6th,

18    do you know?

19          A.    Yes.

20          Q.    If you know, and only if you know,

21    was Mr. Cox also representing your mother or your

22    father at the time?

23          A.    No.

24          Q.    Do you have any record of your

25    conversation or communications with Mr. Cox?
```

JENNA JOHNSON - DIRECT (Young)                    52

1        A.    Do I have any record of our --

2        Q.    Yeah.  Yes.

3        A.    Not that I know of.

4        Q.    Well, do you know when you talked to

5   him?

6        A.    Soon after.  Within a week of the

7   incident was one time.

8        Q.    Did you talk to him by phone prior

9   to, say, a week after the incident?

10       A.    I had -- I had a meeting at his

11   office within a week of the incident.

12       Q.    Was Mr. Cox representing you in

13   contacting people at Creighton University, if you

14   know?

15       A.    Yes.

16       Q.    Did he, on your behalf, talk to

17   anyone else about this incident and pending

18   criminal charges?

19            MR. PHILLIPS:  I'm going to object

20   to that based on the attorney-client privilege.

21   What she knows about who he talked to could only

22   have come from her conversations with her lawyer.

23   She's not going to answer any questions about her

24   conversations with her lawyer or anything she

25   knows based on those conversations.

JENNA JOHNSON - DIRECT (Young)                    53

```
 1              MR. YOUNG:  So you are not going to
 2    provide any information as to even any facts that
 3    Mr. Cox may have given to you or information?
 4              MR. PHILLIPS:  Yes, that's right.
 5              MR. YOUNG:  And I want to make it
 6    clear for the record, I am not asking any
 7    questions with regard to any advice that Mr. Cox
 8    may have given to her.  I am specifically seeking
 9    to inquire as to facts made known to you by
10    Mr. Cox.
11         Q.   Are you still refusing to answer any
12    questions along those lines?
13         A.   Yes.
14         Q.   Mr. Cox communicated with the county
15    attorney's office, did he not, on your behalf?
16              MR. PHILLIPS:  If you know the
17    answer because of something he told you, then
18    we're not going to answer that question because
19    we're not going to talk about anything Mr. Cox
20    told her.
21              MR. YOUNG:  That's fine.  I just
22    need some of the questions to frame my request to
23    the Court.
24              MR. PHILLIPS:  All right.  Don't
25    answer that question.  It's privileged.
```

```
 1          Q.    Mr. Cox, did he communicate on your

 2    behalf with the Omaha Police Department?

 3                MR. PHILLIPS:  Don't answer that

 4    question.  It's privileged.

 5          A.    I'm not going to answer that.

 6                MR. YOUNG:  Let's go off the record

 7    a second.

 8                (An off-the-record discussion was

 9    held.)

10          Q.    Let's go back on the record.

11          On your behalf in Mr. Cox's representation

12    of you, do you know if he contacted or

13    communicated with -- and I've asked the question

14    about Douglas County Attorney's Office and I've

15    asked about the Omaha Police Department, so I'm

16    going to ask about the rest of the world pretty

17    much.  Did he contact anyone else with regard to

18    this incident and pending criminal charge?

19          A.    I'm not going to answer that.

20                MR. PHILLIPS:  Because it's

21    privileged.

22          Q.    And I assume all of these refusals to

23    answer will be based upon privilege, correct?

24          A.    Correct.

25          Q.    Okay.  As far as your communications
```

1    with Mr. Cox during the time -- does -- strike

2    that.

3           Is Mr. Cox still representing you?

4           A.    No.

5           Q.    Can you tell me the time period of

6    his representation of you?  I know when it

7    started.  I need to know when it stopped.

8           A.    I believe it was until after the

9    trial.

10          Q.    Anyway, with regard to his

11   representation of you with regard to this

12   matter -- the criminal matter, the incident, can

13   you tell me any other person or entities that he

14   contacted with regard to representing you other

15   than the two entities I've already asked you

16   about?

17          A.    Again, I'm not going to answer that

18   because it's privileged.

19          Q.    Okay.  For the record, I want to

20   clarify, I can't even get information on who

21   Mr. Cox even had any communication with during

22   the time that he represented you?

23              MR. PHILLIPS:  That's correct,

24   because she would only know based on him having

25   told her.

JENNA JOHNSON - DIRECT (Young)                          56

1          Q.    Is that correct?

2          A.    Yes.

3          Q.    Thank you.  All right.  Let's jump to

4    Angie Circo.  Same as during the investigation

5    and up through the trial of this matter, you had

6    conversations with her?

7          A.    Yes.

8          Q.    We're aware of the Project Harmony

9    interview and your dealings with her up to that

10   point in time.  How much contact with her did you

11   have after, let's say, June -- mid June of 2005?

12         A.    Very limited.  I --

13         Q.    Did you talk to her on an ongoing

14   basis?

15         A.    No.

16         Q.    Did your attorney talk to her on an

17   ongoing basis?

18              MR. PHILLIPS:  Objection,

19   privileged.

20         Q.    Well, let's find -- do you know when

21   you talked to her?

22         A.    I -- after the investigation, it was

23   maybe one or two phone calls.  The only ones I

24   remember, she called me to tell me that David had

25   been arrested.  She called me another time saying

1    Creighton had contacted her wanting me to talk to

2    them.  Those are the only times I remember.

3          Q.    What -- when is "after the

4    investigation"?  What -- your answer that you

5    gave me said after the investigation I only

6    talked to her two or three times?

7          A.    After the last -- I mean, after the

8    time that I went down to talk to her about the --

9          Q.    June 22nd or 24th --

10         A.    Right.

11         Q.    -- whenever that was?

12         A.    Right.

13         Q.    All right.  You didn't talk to her

14   very much after that?

15         A.    Not that I remember.

16         Q.    All right.  And after that point in

17   time, do you recall what you did discuss with her

18   when you did talk to her?

19         A.    For the time I remember, yes.

20         Q.    Well, what one -- what do you

21   remember is what I'm asking?

22         A.    I believe -- I believe over the

23   course of the summer she might have called to

24   clarify a fact or get -- she might -- she would

25   call me quickly to clarify facts or I believe one

JENNA JOHNSON - DIRECT (Young)                    58

```
 1    time she had to get contact information for one
 2    of my friends, and then she called me after David
 3    was arrested, and then another time after that
 4    with a request from Creighton.  That's all the
 5    times I remember.
 6         Q.    Well, in 2006 did she call you any
 7    time in June or July regarding an ongoing
 8    investigation?
 9         A.    No.
10         Q.    So you couldn't have provided her
11    with any information with regard to a search
12    warrant or an affidavit for a search warrant that
13    got issued in that time period?
14         A.    No.
15         Q.    Did you know that there was going to
16    be a search warrant issued?
17         A.    No.
18         Q.    Did you know when David Young was
19    going to be arrested?
20         A.    No.
21         Q.    Did you know that he was going to be
22    arrested?
23         A.    No.
24         Q.    So you were not advised that an
25    arrest warrant was sworn out and filed?
```

 1          A.    No.

 2          Q.    And you weren't aware that an arrest

 3   warrant was signed by the -- by the county court?

 4          A.    No.

 5          Q.    Were you aware of the county

 6   attorney's office activities in attempting to

 7   subpoena David Young's -- David Young's records

 8   from Creighton?

 9          A.    No.

10          Q.    Well, were you aware of information

11   that was to be disclosed -- that was disclosed by

12   the Omaha Police Department upon Mr. Young's

13   arrest?

14          A.    I'm sorry.  What was the question?

15          Q.    Did you know what information the

16   Omaha Police Department disclosed at the time of

17   Mr. Young's arrest?

18          A.    To the general public?

19          Q.    Yes.

20          A.    No.

21          Q.    Were you aware that KETV was going to

22   run a news report on the arrest?

23          A.    No.

24          Q.    Did you know -- I think it was July

25   2006 there was a search warrant that was -- a

JENNA JOHNSON - DIRECT (Young)                    60

1    no-knock search warrant that was issued on

2    Creighton University?

3         A.    No.

4         Q.    Did you know that the State had moved

5    to continue the trial -- the criminal trial?

6         A.    Remind me what continue means.

7         Q.    Delay it, put it off to a later date?

8         A.    I know that it was delayed at least

9    once or twice.

10        Q.    Well, I think --

11        A.    I don't remember.

12        Q.    Let me clarify the question.

13        A.    Okay.

14        Q.    I believe there was a motion for a

15   continuance on the 17th of July of 2006.  Were

16   you aware of that?

17        A.    No.

18        Q.    Were you aware that the county

19   attorney's office was considering other -- filing

20   other criminal charges against Mr. Young after

21   the jury's decision?

22        A.    No.

23             MS. LYNCH:  Object, form and

24   foundation.

25        Q.    That's fine.  Did you have any

JENNA JOHNSON - DIRECT (Young)                                    61

1   knowledge of any attempts by anyone to assure

2   that David Young did not get admitted to

3   Creighton Law School?

4        A.    No.

5        Q.    Were you aware that Mr. Young had

6   been arrested on a traffic citation on July 30 of

7   2006?

8        A.    No.

9        Q.    Did anybody provide you any

10  information or make any statements to you that

11  there were other claims of sexual assaults by

12  David Young?

13       A.    Yes.

14       Q.    Who was that?

15       A.    Desiree Shipman.

16       Q.    What did she say?

17       A.    When I first talked to her, I said

18  that my whole reason for reporting this was that

19  I had heard from other girls at Creighton that

20  David was known to assault women and that this

21  had happened before and that he hadn't been held

22  responsible for it, and she said, yes, I know, we

23  have a whole file on him.

24       Q.    Well, let me pick up on that subject.

25  What information did you have and who did you get

1    it from and when?  That's three questions.  What

2    information -- who -- who provided you with any

3    information on that subject?

4         A.    Katie Ryan.

5         Q.    And when did she provide you with

6    that information?

7         A.    Before I talked to Desiree Shipman.

8         Q.    That would be after the incident?

9         A.    Correct.

10        Q.    Within the first day or so?

11        A.    Yes.

12        Q.    And what did she say to you?

13        A.    Katie?

14        Q.    Yes.

15        A.    Katie told me that she had talked to

16   a resident assistant who had told her that David

17   had been barred from dorms because of prior

18   incidences and that this RA personally knew women

19   who had had problems with him.

20        Q.    Okay.  Do we know who this RA --

21   resident assistant?

22        A.    I have no idea.

23        Q.    And did Katie Ryan indicate when she

24   was told this by this resident assistant?

25        A.    After my assault, but before Katie

JENNA JOHNSON - DIRECT (Young)                          63

1    talked to me.  So my assault happened, Katie and

2    I talked about it.  On that Sunday, Katie talked

3    to this RA and then immediately talked to me.

4         Q.    Anybody else make those statements to

5    you?

6         A.    In preparing for this trial, the

7    prosecutors told me that they had learned that

8    there had been other reports by other women made,

9    but they didn't give me details on who or when or

10   what.

11        Q.    And that's the only information that

12   you have claiming sexual assault, then, is Katie

13   Ryan repeating what somebody else had told her

14   about something else that happened.  That's one,

15   correct?

16        A.    Correct.

17        Q.    And then the prosecutor saying that

18   they had something else -- they had learned of

19   something else?

20        A.    Correct.

21        Q.    Any specifics?

22        A.    About what?

23        Q.    The claimed other sexual assaults.

24        A.    Well, I -- I said they told me that

25   they had learned from -- I believe from his

1    student file.  These weren't just abstract

2    claims, that there were concrete prior incidences

3    that they were going to try to use in my case,

4    but they didn't know if they would be able to,

5    but they really kept me out of the loop.  I had

6    no idea.

7         Q.    You have no more specifics than that?

8         A.    Exactly.

9         Q.    That's what I was asking.  There's an

10   allegation in the Complaint with regard to a

11   higher up at the World-Herald.  Are you familiar

12   with that?

13        A.    Yes.

14        Q.    Is there any such higher up, to your

15   knowledge?

16        A.    To my knowledge, no.

17        Q.    All right.  Let's go back to your

18   answers to discovery.  I believe we've already

19   completed Circo.  You didn't talk to her much

20   after the initial investigation.

21        Who is Lynn Safranek?

22        A.    She's a police reporter at the

23   World-Herald.

24        Q.    Your Answers to Interrogatories

25   indicate that you talked to her.

1        A.     Yes.

2        Q.     Did you -- can you tell me about

3    that?  When?  What about?

4        A.     A day after David was arrested, she

5    called me and said that she and another editor at

6    the World-Herald had learned about the incident

7    ever since the police report was filed, but they

8    don't report on such things until an arrest is

9    made and so it never came up to that point.  When

10   he was arrested she was calling me to inform me

11   that they had decided not to write anything about

12   it, and not because I was an employee there or my

13   dad was an employee there, but because they

14   weren't interested in doing the story.

15       Q.     Any other conversations with her or

16   was that it?

17       A.     That was it.

18       Q.     Let's deal with Sandy Denton, contact

19   and communication with her.  Would you tell me

20   about it?

21       A.     She was the prosecutor on the case.

22       Q.     All right.

23       A.     So I met with her a handful of times.

24       Q.     Do you recall the first time you

25   talked or met her -- talked to her or met her?

1          A.     I don't remember specifically.

2          Q.     Was it in 2005?

3          A.     I'm trying to remember.  No, I don't

4     think -- I don't know.

5          Q.     How about Matt Kahler, do you know if

6     you talked to him in 2005?

7          A.     No.

8                 MR. PHILLIPS:  No, you don't know,

9     or, no, you didn't talk to him?

10                THE WITNESS:  I don't know.  I don't

11    know.  I don't -- I don't know.

12         Q.     When is the first time that you

13    recall having any contact with anyone at the

14    county attorney's office?

15         A.     When I got subpoenaed for the

16    preliminary hearing.

17         Q.     Which would have been sometime

18    probably in September or October?

19         A.     I believe it was, yes.  I don't

20    remember.

21         Q.     You didn't talk to anybody at the

22    county attorney's office prior to Mr. Young being

23    arrested?

24         A.     No.

25         Q.     With regard to what you just

JENNA JOHNSON - DIRECT (Young)                    67

```
 1    mentioned, the preliminary hearing, who contacted
 2    you, if you recall?
 3         A.    No one contacted me.  I contacted
 4    them.
 5         Q.    Who did you contact?
 6         A.    I called -- I don't remember.  I
 7    don't remember.
 8         Q.    Do you remember what you contacted
 9    the county attorney's office about?
10         A.    I had been subpoenaed by James Martin
11    Davis to appear at a preliminary hearing and
12    wanted guidance on what -- how to handle that,
13    and so I contacted the county attorney's office
14    and they put me in touch with someone there.
15    Honestly, I don't remember if it was Sandy or not
16    because it ended up I didn't get called.  I just
17    spent a day sitting on a bench.
18         Q.    Well, let's follow up with other
19    contacts with Sandy Denton.  What -- when do you
20    first recall dealing with Sandy Denton?
21         A.    I remember at one point I went and
22    met with her in her office just to meet her and
23    for her to go over how the case was going to go
24    and what to expect.  And then I met with her
25    another time to talk about the whole oral sex
```

JENNA JOHNSON - DIRECT (Young)                    68

```
 1    thing.  I met with her one time to prepare -- or

 2    actually that -- no.  That came up during a

 3    conversation with my parents for my deposition.

 4    She was at my deposition.  Before trial we met

 5    maybe one, two more times.  That was it.

 6         Q.   In preparing for your deposition, is

 7    that when you had conversations with Sandy Denton

 8    about the oral sex issue?

 9         A.   Yes.

10         Q.   Did she provide any information to

11    you with regard to being under oath and telling

12    the truth?

13         A.   Yes.

14         Q.   Is that the first time that you

15    advised anybody in the county attorney's office

16    with regard to, I'll say, the consensual sexual

17    conduct that occurred on the morning of the 5th

18    of June?

19              MS. LYNCH:  Objection, foundation,

20    what we're talking about, consensual sexual

21    conduct.

22         Q.   Go ahead and answer.

23         A.   Are you talking about the oral sex?

24         Q.   Yes.  Yeah.

25         A.   And the question again was?  I'm
```

JENNA JOHNSON - DIRECT (Young)                           69

 1    sorry.  Well, I want to make sure I'm answering

 2    the right question.

 3         Q.    Well, that's fine.  That's fine.  I'm

 4    not -- I'm trying to remember the question I

 5    asked you.

 6         A.    Okay.

 7         Q.    I'm not -- I'm not -- all right.

 8    What -- what I'm trying to find out is whether

 9    that was the first time that the county

10    attorney's office or anybody in the county

11    attorney's office knew about the oral sex and any

12    other consensual sexual conduct that occurred on

13    that morning of June 5th of 2005.

14              MR. PHILLIPS:  Objection,

15    foundation.  Go ahead and answer.

16         A.    That was the first time I told them

17    about the oral sex.

18         Q.    All right.  To your knowledge, had

19    anybody else told them about the oral sex?

20         A.    I have no idea.

21              MS. LYNCH:  Objection, foundation.

22              MR. YOUNG:  That's why I asked to

23    her knowledge.

24         Q.    All right.  You have no idea, right?

25         A.    Right.

JENNA JOHNSON - DIRECT (Young)                    70

1          Q.    Were you just, by the way, meeting

2     with Sandy Denton or was Matt Kahler also

3     present?

4          A.    He was added to the case later.  I

5     don't remember at which point he started being at

6     meetings.

7          Q.    Do you recall dealing with him prior

8     to your deposition?

9          A.    Yes.

10         Q.    Who attended your deposition from the

11    county attorney's office?

12         A.    Sandy Denton for sure.  I don't

13    remember if Matt was there or not.

14         Q.    Okay.  Was Mr. Cox there?

15         A.    No.

16         Q.    And then after the deposition, you

17    say you only -- you indicate you only had a

18    couple conversations or meetings with her with

19    regard to getting ready for trial?

20         A.    Yes.

21         Q.    How about Mr. Kahler, contact and

22    communication with him?

23         A.    The same as with Sandy.

24         Q.    Okay.  But that was after, later on,

25    at least at the point where your deposition was

JENNA JOHNSON - DIRECT (Young)                              71

1    going to be taken and thereafter --

2         A.    Right.

3         Q.    -- with Mr. Kahler?

4         A.    Right.

5         Q.    Do you recall any -- any

6    conversations between the two of you?

7         A.    Any one-on-one conversations I had

8    over the phone was just with Sandy.  Any time I

9    had a meeting Matt was also there.

10        Q.    Do you recall anything about any of

11   those meetings, what was discussed?

12        A.    Just typical preparing to testify.

13        Q.    Let's go to Amy Bones.  What kind of

14   discussions did you have with Amy Bones?

15        A.    As far as I can remember, I think I

16   only had one.  I only recall one telephone

17   conversation with her.

18        Q.    When was that?

19        A.    After the trial, in the fall of that

20   year.

21        Q.    And who made the phone call?

22        A.    I called her.

23        Q.    And why did you call her?

24        A.    I had called Sister Schmeling to find

25   out what the results of any disciplinary action

1     that was taken against your son was.  Schmeling

2     said she couldn't tell me, that I had to call

3     Bones.  I called Amy Bones and she told me that

4     they couldn't release that information.

5            Q.    Is that the only time you talked to

6     her?

7            A.    As far as I remember, yes.

8            Q.    Your Answers to Interrogatories

9     indicate you may have talked to others which you

10    then didn't recall.  Is there anybody else you

11    recall, as you sit here today, talking to about

12    this incident, Mr. Young's application for

13    admission to Creighton Law School, the

14    prosecution, charges, et cetera?

15           A.    Not that I can think of.

16                 MR. YOUNG:  Can we take about a

17    five- or ten-minute break?

18                 MR. PHILLIPS:  Sure.

19                 (A short recess was taken.)

20                 MR. YOUNG:  Okay.  Back on the

21    record.

22           Q.    Mrs. Johnson -- Ms. Johnson, you had

23    no idea that Officer Circo was going to attempt

24    to obtain a search warrant, a no-knock search

25    warrant on Creighton University prior to it

```
 1    occurring?

 2         A.    Right.  I had no idea.

 3         Q.    Do you know when you might have found

 4    out about it?  Well, did you find out about it?

 5         A.    No -- or when?

 6         Q.    Well, did you find out that there was

 7    a search warrant served on Creighton to obtain

 8    David Young's records?

 9         A.    No, I didn't know that.

10         Q.    Okay.  But I believe in the prior

11    testimony you indicated that one of the

12    prosecutors said they had gotten records from

13    Creighton?

14         A.    I don't know how they got those.

15         Q.    I'm not indicating you did.

16         A.    Right.  I knew that they had them.

17         Q.    All right.  And just for the record,

18    you aren't going to provide any information --

19    testimony with regard to any information that

20    Mr. Cox has provided to you based on

21    attorney-client privilege; is that correct?

22         A.    Yes.

23         Q.    And I'm dealing with questions -- or

24    I would be dealing with questions -- strike that.

25         I would be asking questions dealing with
```

```
 1    factual matters as opposed to advice he has given

 2    you.  Do you understand that?

 3         A.    Yes.

 4         Q.    All right.  And you're still

 5    refusing?

 6         A.    Yes.

 7              MR. YOUNG:  Okay.  I think I got my

 8    record.  I have no further questions.

 9                  CROSS-EXAMINATION

10    BY MR. THELEN:

11         Q.    Ms. Johnson, my name is Al Thelen.

12    I'm with the Omaha City Attorney's Office and I

13    represent Detective Circo and Sergeant Alan Reyes

14    and Sergeant Teresa Negron and the City of Omaha

15    in this case.  I just have a handful of questions

16    for you.

17              MR. PHILLIPS:  Excuse me.  Before

18    you start, because you're looking at him, you're

19    going to have to really project so he can get

20    your testimony.  All right?

21              THE WITNESS:  Yes.

22         Q.    Obviously, as you testified, you had

23    a lot of communications with Dr. -- with

24    Detective Circo regarding the David Young matter,

25    correct?
```

      1              A.     Correct.

      2              Q.     And when I say "David Young matter,"

      3     I'm referring to the incident with David Young

      4     and then the subsequent investigation and

      5     criminal prosecution of David Young.  Okay?

      6              A.     Okay.

      7              Q.     And I think you testified that you

      8     also met with Officer Cunningham from the Omaha

      9     Police Department?

     10              A.     Correct.

     11              Q.     And was that at your house, your

     12     mother's house?

     13              A.     Yes.

     14              Q.     And that was the Monday after the

     15     incident?

     16              A.     Yes.

     17              Q.     Other than Officer Cunningham and

     18     Detective Circo, have you ever had any other

     19     communications with any Omaha Police Department

     20     people about the David Young matter?

     21              A.     No.

     22              Q.     Now, you've testified that Detective

     23     Circo never pressured you to testify one way or

     24     the other as to the facts in this David Young

     25     matter, correct?

JENNA JOHNSON - CROSS (Thelen)                           76

1    A.    Yes.

2    Q.    Did anyone else from the Omaha Police

3    Department ever pressure you to slant your

4    testimony one way or the other regarding the

5    David Young matter?

6    A.    No.

7    Q.    Did anyone else from the Omaha Police

8    Department pressure you in any respect regarding

9    your testimony in the David Young matter?

10   A.    No.

11   Q.    When you were talking about Detective

12   Circo earlier, you were talking about a meeting

13   of approximately June 22nd when, in the morning,

14   you had the phone call and you admitted the oral

15   sex and then you came in to meet with her later

16   in the day and denied the oral sex, correct?

17   A.    Correct.

18   Q.    That was approximately June 22nd of

19   2005?

20   A.    Yes.

21   Q.    And you said Detective Circo didn't

22   try to pressure you with respect to your

23   testimony on that day?

24   A.    Correct.

25   Q.    Did Detective Circo attempt to

JENNA JOHNSON - CROSS (Thelen)                          77

1    pressure you regarding your testimony about David

2    Young -- about the David Young matter any other

3    day?

4         A.    No.

5         Q.    At all other times she just

6    emphasized telling the truth?

7         A.    Yes.

8         Q.    You were asked a series of questions

9    about what the Omaha Police Department knew about

10   this incident at the time that they had the

11   arrest warrant issued.  Do you recall that

12   testimony?

13        A.    Yes.

14        Q.    Now, obviously you can't testify to

15   what everybody in the Omaha Police Department had

16   in their minds at the time of the arrest warrant,

17   correct?

18        A.    Correct.

19        Q.    Your testimony was that Detective

20   Circo, anyway, knew what you had told her in the

21   Project Harmony interview that was videotaped,

22   correct?

23        A.    Correct.

24        Q.    But in between the time of that

25   Project Harmony videotaped interview and the time

1      that the police department issued the arrest

2      warrant, the police kept investigating the case,

3      isn't that at least possible?

4                   MR. YOUNG:  Objection, foundation.

5             A.    I assume they did.

6             Q.    Okay.  Well, for example, the police

7      gathered information through the one-party

8      consent call between you and David Young,

9      correct?

10            A.    Correct.

11            Q.    And after -- that happened after the

12     Project Harmony interview that was videotaped?

13            A.    Yes.

14            Q.    The June 22nd phone call and meeting

15     between you and Detective Circo, that happened

16     after that initial -- that initial Project

17     Harmony videotaped meeting, correct?

18            A.    Correct.

19            Q.    So that's another source of

20     information for the police about this incident

21     that occurred in between those two times?

22            A.    Yes.

23            Q.    And it's possible that in that period

24     of time between June 16th and the issuance of the

25     arrest warrant, that the Omaha police did other

JENNA JOHNSON - CROSS (Dolan)                               79

```
 1    interviews of other potential witnesses in this
 2    case, correct?
 3            A.    Exactly.
 4            Q.    Including David Young?
 5            A.    Yes.
 6            Q.    All of those things could have added
 7    to the police department's knowledge of the facts
 8    regarding this David Young matter, correct?
 9            A.    Yes.
10                  MR. YOUNG:  Objection, foundation.
11                  MR. THELEN:  Thank you, ma'am.  I
12    have no other questions.
13                  MR. DOLAN:  Mr. Phillips, do you
14    mind if we question her?
15                  MR. PHILLIPS:  Oh, of course not.
16                     CROSS-EXAMINATION
17    BY MR. DOLAN:
18            Q.    Ms. Johnson, my name is Tim Dolan,
19    and I'm a Deputy Douglas County Attorney working
20    with Kristin Lynch on this matter.  We represent
21    Douglas County, Stuart Dornan, Sandy Denton and
22    Matthew Kahler.  Do you understand that?
23            A.    Yes.
24            Q.    I have just a few follow-up questions
25    for you this morning based on Mr. Young's
```

1  questions.  If at any point I ask you a question

2  you don't understand, will you let me know and

3  I'll try to rephrase it?

4       A.    Definitely.

5       Q.    I don't know that in my career I've

6  ever gotten through a deposition where somebody

7  didn't look at me and ask me -- take me up on

8  that offer.  So I'll throw that out there in

9  advance.

10      If at some point you need to speak to

11 Mr. Phillips, you need to let us know, or if you

12 need a break, let us know.

13      A.    Definitely.

14      Q.    You've previously described the

15 incident with the plaintiff, Mr. Young, but was

16 there ever any doubt in your mind that you had

17 identified the right person in the plaintiff,

18 David Young, when you spoke with the police?

19      A.    Never any doubt.

20      Q.    Was there any doubt in your mind that

21 you identified the correct individual in the

22 plaintiff, David Young, when you spoke with the

23 Creighton campus security officers?

24      A.    No doubt.

25      Q.    Was there ever any doubt in your mind

1    that you had identified the correct individual in

2    David Young when you spoke with the prosecutors,

3    Sandy Denton and Matt Kahler?

4         A.    No.

5         Q.    Now, there was questioning earlier on

6    with respect to Exhibits 1, 2 and 3.  I would ask

7    you to pick those up, if you don't mind.  I'm

8    going to run through each one of those.

9    Specifically I'd like to talk with you about the

10   touching that is described in Exhibits 1, 2 and 3

11   that you have been questioned about and actual

12   penetration that is mentioned in subsequent

13   reports.

14        When you first spoke with security personnel

15   from Creighton, for instance, in Exhibit No. 1,

16   were you -- when you said there was sexual

17   touching, can you tell us what you meant by that?

18   Do you know, when you first spoke with them, what

19   you meant by "touching"?

20        A.    By "touching" I meant that he was

21   putting his fingers inside my vagina.

22        Q.    Do you know if you were ever asked

23   during the trial how you had defined "touching"

24   when you were making these original reports?  Did

25   anybody ever ask you that?

JENNA JOHNSON - CROSS (Dolan)                          82

1          A.     No.

2          Q.     Did the prosecutors ever ask you

3    that?

4          A.     I don't remember.

5          Q.     Looking at page 2 of Exhibit No. 1,

6    two sentences in, there's a sentence:  She does

7    not believe that he ever penetrated her or ever

8    successfully forced intercourse.

9          Do you remember making that statement to the

10   security officers at Creighton?

11         A.     I remember them -- I remember them

12   asking just point blank was there penetration.

13         Q.     And was that after you told them he

14   had his pants off?

15         A.     Yes.

16         Q.     Do you understand them to be asking

17   if he had penetrated with his penis?

18         A.     That's all I thought it could mean.

19         Q.     So it's your recollection, and I'm

20   asking at the time, if you remember, of that

21   statement on page 2 of Exhibit No. 1, that she

22   does not believe that he ever penetrated her or

23   ever successfully forced intercourse, is it your

24   recollection that you meant that he had not

25   penetrated you with his penis?

JENNA JOHNSON - CROSS (Dolan)                    83

```
 1         A.    Exactly.

 2         Q.    Were you excluding digital

 3    penetration when you told officers that or were

 4    you just not asked?

 5              MR. YOUNG:  Counsel, I'm going to

 6    object to the questions as being leading.

 7              MR. DOLAN:  It's cross-examination.

 8              MR. YOUNG:  You may consider it

 9    cross, I consider it not cross because of the

10    relationship with the defendant, but I just want

11    to make my objection for the record.

12              MR. DOLAN:  The objection is duly

13    noted.

14              MR. YOUNG:  Thank you.

15         Q.    Did you understand my question?

16         A.    Ask it again.

17         Q.    Were you ruling out digital

18    penetration when you spoke with the security

19    officers from Creighton?

20              MR. YOUNG:  Same objection.

21         A.    Yes -- or I -- I thought when they

22    said penetration, they only meant with a penis.

23    I didn't think that digital was included in that.

24         Q.    Did you ever ask them -- did you ever

25    make any effort --
```

JENNA JOHNSON - CROSS (Dolan)                    84

```
 1          A.    No.
 2          Q.    -- to make sure you were all on the
 3    same page?
 4          A.    Not really, no.
 5          Q.    And did you think when you spoke of
 6    touching that that encompassed digital
 7    penetration?
 8          A.    Yes.
 9          Q.    At some point was the difference
10    between touching and penetration explained to
11    you?
12          A.    Yes.
13          Q.    And do you remember who explained
14    that to you?
15          A.    Well, when the police reporting line
16    called me back, the woman asked me what happened,
17    and I said, well, I woke up and he was touching
18    me.  She said, well, where was he touching you?
19    Where were his fingers?  What was he doing?  And
20    then I told her, and she said, ma'am, that is a
21    sexual assault and I'm going to dispatch you
22    through to 911.
23          Q.    And that was after contacting the
24    Omaha Police Department?
25          A.    Right.
```

JENNA JOHNSON - CROSS (Dolan)                    85

```
 1            Q.    So is it fair to say that the Omaha
 2    Police Department asked more pointed questions
 3    than Creighton security?
 4            A.    Definitely.
 5            Q.    All right.  And I believe you
 6    testified neither Ms. Denton or Mr. Kahler told
 7    you to lie; is that correct?
 8            A.    Correct.
 9            Q.    Did they advise you to tell the
10    truth?
11            A.    Yes.
12            Q.    Did either Ms. Denton or Mr. Kahler
13    ever pressure you to keep your story consistent
14    with what you had originally reported?
15            A.    No.
16            Q.    I mean, did they ever tell you don't
17    reveal the oral sex?
18            A.    No.
19            Q.    Did you ever meet defendant Stuart
20    Dornan?
21            A.    No.
22            Q.    Would you recognize him if he walked
23    in the door this morning?
24            A.    No.
25            Q.    He's not going to walk in the door
```

1    this morning.  Did you ever talk with him on the

2    phone?

3         A.    No.

4         Q.    Did you ever talk with your parents

5    about Mr. Dornan?

6         A.    No.

7         Q.    Do you recall if you ever talked with

8    anybody about Mr. Dornan?

9         A.    No.

10        Q.    Do you -- do you know whether or not

11   Mr. Dornan was involved in prosecuting the case

12   against the plaintiff?  Did he ever sit in on any

13   of the meetings?

14        A.    No.

15        Q.    And were you ever shown copies of the

16   records from Creighton University that have been

17   discussed earlier?

18        A.    No.

19        Q.    And do you know -- Mr. Kahler, I

20   believe your testimony was, that they had

21   mentioned that they learned of other reports, but

22   they didn't give you the details of the reports

23   involving the plaintiff, David Young, that they

24   didn't give you any details?

25        A.    I believe they told me that it was

```
 1    from his student file but no -- no details about

 2    it.

 3         Q.    They never showed you any physical

 4    documents?

 5         A.    No.

 6         Q.    Do you know whether at that time they

 7    had physical documents?

 8         A.    I have no idea.

 9              MR. DOLAN:   I'd like to have a

10    moment.

11              (An off-the-record discussion was

12    held.)

13         Q.    One last line of questioning.  At

14    some point were you told that the plaintiff,

15    David Young, had been arrested?

16         A.    Yes.

17         Q.    And do you remember approximately

18    when that was?  Toward the end of August of 2005?

19         A.    Yes.

20         Q.    Prior to -- and do you know how you

21    learned that?

22         A.    Angie Circo called me.

23         Q.    Prior to Officer Circo calling you,

24    had you spoken with anyone from the Douglas

25    County Attorney's Office?
```

JENNA JOHNSON - REDIRECT (Young)                          88

```
 1        A.    No.
 2        Q.    And prior to her calling to tell you
 3   that Mr. Young had been arrested, you hadn't
 4   spoken with anyone from the county attorney's
 5   office?
 6        A.    No.
 7             MR. DOLAN:  Ms. Johnson, I have no
 8   further questions.  I appreciate your time.
 9             MR. PHILLIPS:  There may be
10   follow-up questions.
11                 REDIRECT EXAMINATION
12   BY MR. YOUNG:
13        Q.    You may not have talked to the
14   Douglas County Attorney's Office, but do you know
15   if your lawyer did?
16        A.    I'm not going to answer that.
17        Q.    You're invoking the attorney-client
18   privilege again?  Yes?
19        A.    Yes.
20             MR. YOUNG:  All right.  I have
21   nothing further.
22             MR. PHILLIPS:  Okay.
23             MR. THELEN:  Nothing further.
24             MR. PHILLIPS:  Jenna, one thing we
25   didn't talk about that we should have, you have
```

1    the right to read and sign the transcript of this

2    deposition when it's been prepared.  If you say I

3    talked to Smith and the reporter puts down I

4    talked to Schmidt, you can make a note on a

5    separate correction page that it should have been

6    Smith.  You have 30 days from the day the

7    transcript is sent to you to finish that, to make

8    your corrections on a separate page, sign it,

9    have it notarized and return it to the reporter.

10   You know your schedule better than I do.

11   Typically witnesses waive, but you need to make

12   the choice and tell the court reporter before we

13   stop today.

14            THE WITNESS:  Okay.  Well, I'll

15   probably just waive that then.

16            (The deposition was concluded at the

17   hour of 11:42 a.m.)

18

19

20

21

22

23

24

25

- C E R T I F I C A T E -

STATE OF NEBRASKA    )
                     ) ss.
COUNTY OF DOUGLAS    )

   I, Alvin J. Thibault, CSR, and General Notary Public in and for the State of Nebraska, do hereby certify that JENNA JOHNSON was by me duly sworn to testify the truth, the whole truth and nothing but the truth, and that the deposition by her as above set forth was reduced to writing by me.

   That the within and foregoing deposition was taken by me at the time and place herein specified and in accordance with the within stipulations, the reading and signing of the witness to her deposition having been waived.

   That I am not counsel, attorney or relative of either party or otherwise interested in the event of this suit.

   IN TESTIMONY WHEREOF, I have placed my hand and notarial seal this 19th day of May, 2009.

_____

GENERAL NOTARY PUBLIC

COST:  $ _____

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEBRASKA
 2
       DAVID J. YOUNG,                    )
 3                                        ) Case No.
                          Plaintiff,      ) 8:07-CV-00265
 4                                        )
             v.                           )
 5                                        )
       STUART J. DORNAN,                  )
 6     individually and in his            )
       official capacity; DOUGLAS         )
 7     COUNTY, NEBRASKA, a                 )
       political subdivision of the       )
 8     State of Nebraska, et al.,         ) CERTIFICATE OF
                                          ) REPORTER
 9                        Defendants.     )

10              I, Alvin J. Thibault, RPR, CSR and General
       Notary Public, do hereby certify that I served as
11     the Court Reporter at the deposition of JENNA
       JOHNSON on May 14, 2009 at Erickson Sederstrom,
12     10330 Regency Parkway Drive, Suite 100, Omaha,
       Nebraska in which the costs of reporting and
13     transcribing the deposition were $ 375.00, and
       that such costs are to be paid by counsel for the
14     plaintiff.
                I further certify that the original and
15     copies were sent to:  Original and 1 copy to
       Mr. Thomas J. Young; 1 copy to Mr. Alan M.
16     Thelen; 1 copy to Mr. Douglas L. Phillips and 1
       copy to Ms. Kristin M. Lynch.
17
                Dated this 19th day of May, 2009.
18

19

20                    _____
                      GENERAL NOTARY PUBLIC
21                    Alvin J. Thibault, RPR
                      Thibault, Suhr & Thibault, Inc.
22                    6818 Grover Street
                      Omaha, Nebraska  68106
23                      (402) 331-2500

24

25
```