1    Q.   Were you contacted by either the
2  police or the county attorney's office with
3  regard to the case?
4    A.   With regard to -- before the trial?
5    Q.   Before or shortly after the trial?
6    A.   Well, never by the police.  The -- I
7  did hear from, either directly or indirectly,
8  people in the county attorney's office about the
9  case.
10   Q.   Okay.  Do you recall if that was
11 before the trial or after the trial?
12   A.   Well, it was some of each.  And in
13 the late spring of 2006 Jennifer Thompson, also
14 sometimes went by the name Icenogle, but Jennifer
15 Thompson handed to either Julie Nearman or Andrea
16 Bashara, maybe both, a packet of printouts from a
17 Xanga, X A N G A, and I think Facebook, might
18 have been MySpace, one of the two, pages that
19 were evidently from -- from David's -- David
20 Young's account that -- I never conversed with
21 Jennifer about that, and, as I said, the
22 affidavit I gave her, I had never had a
23 conversation with her about that, but I did -- I
24 did get those documents from Andrea or Julie.  I
25 also had -- I believe that I was contacted by

1   another student named James Meuret, who was
2   either working part time or an attorney at the
3   county attorney's office about the case.  I
4   believe -- my recollection is that James spoke to
5   me once about the case before it went to trial
6   and then either spoke to me or e-mailed me about
7   the case after the trial.  And then shortly after
8   the trial I was called by a -- an attorney in the
9   county attorney's office, I cannot recall his
10  name, but he -- he evidently was one of the
11  lawyers who had direct responsibility for
12  prosecuting the case, and he talked to me about
13  the case after the acquittal.
14        Q.    Would it be Matt Kahler?
15        A.    Possibly.  I don't recall.  It's
16  possible.
17        Q.    Okay.  Is that it, as far as you
18  recall, contact from police or county attorney's
19  office?
20        A.    Yes.  I mean, I also -- I mean, I
21  also was contacted by Jim Davis on several
22  occasions.
23        Q.    Mr. Young's criminal attorney?
24        A.    Correct.
25        Q.    Well, let me take a step back then.

1    was hopeful that David would not be admitted into
2    law school.
3         Q.   Did he give any indication at that
4    time, when he made those statements, he was
5    making those on behalf of the county attorney's
6    office?
7         A.   No.
8         Q.   James was also a law student at
9    Creighton University at that time?
10        A.   Yes.
11        Q.   So it was possible that he was making
12   those comments and those statements as a student
13   at Creighton University and hopeful that his alma
14   mater, the school he was attending, would
15   consider things like that?
16        A.   Yeah, that's possible.
17        Q.   And he never indicated that he was
18   directed to make those statements by anybody in
19   the county attorney's office or the county?
20        A.   No.
21        Q.   You also indicated that you received
22   a call shortly after the trial was concluded from
23   somebody representing themselves to be from the
24   county attorney's office, correct?
25        A.   Correct.

1    Q.   You've indicated, I think quite a few
2    times, that you cannot remember the name of this
3    person?
4    A.   This is true.
5    Q.   So would it be a correct assumption
6    you were never able to verify that that person
7    was actually employed with the county attorney's
8    office?
9    A.   That's true.  Although I do remember
10   that the caller ID on it said county attorney's
11   office or at least it was a 444 number --
12   Q.   So --
13   A.   -- from Douglas County.
14   Q.   But there's many phones that have the
15   444 prefix.
16   A.   This is true, but I -- yeah, I guess
17   that's true.
18   Q.   And even if the call was made from
19   the county attorney's office, you have no way to
20   verify that it was an employee of the county
21   attorney's office who made the call?
22   A.   I suppose that's true.  Although it
23   would have had to have been a pretty elaborate
24   ruse, because the person was clearly familiar
25   with the case.  It had to have been somebody who

1   knew a lot about the case that would have known,
2   for instance, that -- that David's sister was in
3   attendance at the case, would have known that the
4   jury was deadlocked.
5        Q.   Sure.
6        A.   So a -- I didn't have any reason to
7   doubt that the person said he was who he was,
8   but, I mean, metaphysically is it possible it was
9   someone else, I guess so.
10       Q.   For instance, a court reporter that
11   was reporting the case?
12       A.   I guess that's possible.
13       Q.   In the call by the person purported
14  to be from the county attorney's office, did that
15  person ever specifically say that they didn't
16  recommend David for admission at the University
17  law school?
18       A.   I don't -- I don't know that the
19  person uttered those words in that sequence, but
20  the person did opine that -- that I was in a
21  tough spot because if we didn't admit him, that
22  the Young family was going to be unhappy, and
23  that if we did admit him, that there would be a
24  lot of -- that he and other people at the Douglas
25  County Attorney's Office would be unhappy.  I'm

1   not sure if he said other people in Douglas
2   County, that he would not be happy, and I think I
3   probably said, well, that's why I get the big
4   bucks, that I have to make decisions like that.
5   So I don't -- I mean, I don't know what -- I
6   don't know -- it certainly wasn't anybody trying
7   to instruct me not to admit him, but it wasn't --
8   it was fairly clear to me that whoever was making
9   the call was not -- was hoping that David would
10  not be admitted to law school.
11       Q.    But they never actually said those
12  words?
13       A.    Which words?
14       Q.    That they were hoping he wouldn't be
15  admitted to law school?
16       A.    I don't know.  I don't know
17  whether -- I don't know whether he said exactly
18  that.  I just don't recall.
19       Q.    You stated earlier it was your
20  suspicion that this person who called thought
21  David Young to be a person of low character?
22       A.    Yes.
23       Q.    But that individual never said that,
24  correct?
25       A.    I don't recall whether they said low

character or not. I'm certain the caller used the word "character," but I don't remember. The low character I suspect is my phraseology.

Q. Going back to your communications with Jim Meuret, did those communications impact in any way your decision not to use administrative override so David could have gone to Creighton Law School?

A. You know, I've thought a lot about it, but the answer is no, because, again, everybody from the college, from Douglas County, to James, to Jennifer, to Jim Martin, everybody else, they all seemed to assume that I was like a blank slate and I didn't know anything about David, and it -- it -- I knew a lot about David. I mean, I had -- I had probably put together a couple of hours worth of conversations with him. I read every piece of paper in -- in the file, and, no offense, I was perfectly capable of making up my own damn mind about whether or not I thought he was a fit with Creighton law school. And the reason -- to be perfectly blunt about it, the reason I -- one of the reasons I wanted -- that I got Tulsa to take a late application was I honestly thought that it would do him some good

```
 1   to for once not get what he wanted and to wind up
 2   having to go some other place and step outside of
 3   his comfort zone and grow up a little.  And that
 4   was my motivation.  That's why I did it.
 5        Q.    Okay.  I'm going to go back and ask
 6   the same question regarding the call from this
 7   person -- the male person from the county
 8   attorney's office.  Was there anything else in
 9   that conversation that impacted your decision?
10        A.    Same answer.
11        Q.    Also, getting back to what you said,
12   how much you knew about David Young, beginning
13   with the information about the criminal case, you
14   stated over and over that everybody thought that
15   you were this blank slate and they were telling
16   you stuff, was James Martin Davis, David Young
17   and Tom Young, themselves, the ones who gave you
18   most of that information?
19              MR. YOUNG:  I'm -- I'm going to
20   object on form of the question, because it's
21   multiple persons, but that's the only part of it.
22        A.    I'd say it was -- well, let me go
23   ahead.  I didn't get a whole lot of information
24   about the case as such from David because I think
25   he had been told not to talk about it in any
```